TRULINCS 17813027 - CLINTON, KEVIN - Unit: MIL-H-A

----

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA
Plaintiff,

v.                                    Case 3:18-cr-136

KEVIN CLINTON,
Defendant.



EMERGENCY MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 USC 3582(c)(1)(A)(i)

----

. I am Kevin Clinton, defendant, and I am filing this pro se.

. On October 24, 2019, I was sentenced to 71 months for mail fraud and was taken into custody. My sentence was the top of the guideline range.

. By December 2019, I was at the Satellite Camp at USP Thomson, where I quickly found a job with Facilities. I later changed to be the Education Orderly and Adult Continuing Education (ACE) Tutor.

. On August 6, 2020, I was put into solitary confinement for sending an email to my attorney that listed the locations where the Thomson bus had picked up and dropped off inmates during the BOP's COVID-19 "no inmate transfer period." (Exhibit A)

. Thomson's Special Investigation Supervisor's Office (SIS) investigated and cleared me of any wrongdoing. I was interviewed on August 24, 2021 by a Special Investigation Agent who told me "This makes no sense. I'll get the paperwork processed as quickly as I can to get you out of here and back to camp." I was returned to camp a week later, after 26 days in solitary.

. Four days after returning to camp, I was taken to solitary again. This time for waving to my family from the inmate track. I received two incident reports for the event. One for being in an unauthorized area (Exhibit B) and the other for contact the public without authorization. (Exhibit C) I lost five months of telephone calls and spent three months in solitary for these. After my wife and daughters visited me in December 2019, they slid off an icy road into the ditch. The police office that responded wrote her a ticket. She had to drive four and a half hours to be at the hearing, which was five minutes from Thomson. She asked if I could wave to our daughters (5 and 12) who hadn't seen me in over 6 months. During the time in solitary, I contracted COVID-19 the first time. I reported symptoms and was tested. The next day I was moved from my first floor cell to a cell on the balcony, away from other inmates. I was told I tested positive. I was given 300 milligram generic tylenol with instructions to "take as needed".

/

USDC IN/ND case 3:18-cr-00136-RLM-MGG   document 129   filed 12/06/21   page 2 of 13

TRULINCS 17813027 - CLINTON, KEVIN - Unit: MIL-H-A
----------------------------------------------------------------------------

. No additional testing was done at Thomson, and I was eventually shipped from solitary to Oklahoma City on December 3, 2020. I was placed into a unit there where I witnessed 2 to 3 inmates per day taken out due to COVID-19 infection. I was not tested there.

. On December 22, 2020, I was shipped to FCI Milan, in Milan Michigan. I was tested on arrival by Milan staff and the results were positive. I was placed into quarantine and given a few days supply of generic tylenol and told they had run out.

. While I was in quarantine I tried to get medical care for some of the issues that began with my first COVID infection including constant fatigue, chest pain, a racing and pounding heartbeat and rashes on my arms, legs and abdomen. I was told to visit health services after I was moved to the regular housing.

. FCI Milan had a significant outbreak of COVID-19 in 2020 and at least 3 inmates died. They had a second significant outbreak in December 2020. I arrived during the outbreak.

. "The situation at FCI Milan is serious enough that the Department of Justice Office of the Inspector General investigated the facility in January of this year." United States v. Davis, 2021 U.S. Dist. LEXIS 110636, No. 15-cr-20152 (E.D. Mich. Jun. 2021) "Its report finds as ongoing concerns that the facility design makes social distancing difficult, that FCI Milan still does not test staff for COVID-19, and that there is a need for increased cleaning and hand sanitizer supplies. See Pandemic Response Report 21-032 at 8,14, 15, https://perma.cc/3T3K-7NJQ. The report also highlights several administrative and management failures that exacerbated FCI Milan's COVID-19 outbreaks."

. The report explains that the Unicor Factory at Milan and the H housing unit, which houses many Unicor workers had the highest number of inmates test positive. Id P8.

. I work at Unicor and am housed in H Unit, but there are Unicor workers living in every housing unit. Unicor has over 225 workers in the plant. Working close together in the factory with no social distancing, and no masks provides for easy spread of any infectious illness across all housing units quickly. As the CDC has regularly stated and CNN frequently broadcast, both vaccinated and unvaccinated individuals can carry the virus.

. While Milan Health Services was checking my COVID-19 related health issues, they confirmed my high blood pressure and then discovered I had a heart murmur and an irregular heart beat. This was detected in February 2021. Testing done at Michigan Heart in August, six months after discovery, confirmed issues. I requested copies of the test results so I could send them home for my physician. After sending a copy home, I review them more closely and came up with a couple of questions. I sent the questions to my assigned provider at the Milan Health Services, asking if they could forward the questions to the doctor or get answers some other way. I received a response saying "I cannot forward the questions." (Exhibit D). I am not allowed to challenge a staff member's response.

. The first test report shows, in Study Details, "The underlying ECG rhythm was arrhythmia and sinus rhythm. Study

TRULINCS 17813027 - CLINTON, KEVIN - Unit: MIL-H-A

---

was difficult due to Patient's heart rhythm" (Exhibit E)

. The second test report shows, in Stress Findings "Baseline ECG is abnormal." (Exhibit F) In addition, the Study Details indicate "overall study quality was adequate" suggesting that the study quality was borderline inadequate. Both Black's (Black's Law Dictionary, Abridged Seventh Edition, copyright 2000) and Webster's (Webster's New Pocket Dictionary, copyright 2007) suggest that adequate is the lowest level necessary to satisfy a requirement.

. Permanent heart damage is a known side effect of COVID-19. Dr. Gregg Fonarow, chief of the division of Cardiology at the University of California, Los Angeles said "More recently, there is recognition that even some of those COVID-19 patients not hospitalized are experiencing cardiac injury. This raises concerns that there may be individuals who get through the initial infection, but are left with cardiovascular damage and complications." American Heart Association - https://www.heart.org/en/news/2020/09/03/what-covid-19-is-doing-to-the-heart-even-after-recovery

. Harvard published "Pre-existing heart conditions such as damaged heart muscles or blocked arteries, weaken the body's ability to survive the stress of the illness." Also pointing out "Pre-existing heart conditions and poor metabolic health increase risk of severe COVID-19." Harvard Health - https://www.health.harvard.edu/blog/COVID-19-and-the-heart-what-we-have-learned-2021010621603

. On November 24th, NBC Nightly News reported that infection rates were rising across the country and Michigan's was up 68% over the prior period and has now exceed their highest number of infections since the pandemic began. On November 26th, CNN reported that the Federal Government was sending medical teams to Michigan to assist with the significant increase in COVID-19 cases and hospitalizations.

. CNN has reported a new variant, Omicron, that is spreading and is dramatically different from any prior variant. The new mutation, which is potentially more transmissible was first discovered in South Africa and has since been detected in Australia, United Kingdom, Germany, Israel, Italy, the Czech Republic, and Hong Kong. The World Health Organization (WHO) said early evidence indicates it could pose an increased risk for reinfection and said some of the mutations detected in the variant were concerning. More research is underway. https://www.cnn.com/2021/11/27/world/omicron-coronavirus-variant-intl/index.html

. The list of countries is growing every day as several, including Canada were added today.

. On November 26, the World Health Organization (WHO) classified a new variant, B.1.1.529, as a Variant of Concern and named it Omicron. It has not been confirmed in the United States yet, but the CDC is monitoring. https://www.cdc.gov/media/releases/2021/s1126-B11-529-omicron.html

. As cases are rising dramatically outside, FCI Milan is returning to normal operations.

TRULINCS 17813027 - CLINTON, KEVIN - Unit: MIL-H-A

---

. The Chow Hall has reopened for every meal and we eat sitting shoulder to shoulder. Some of the staff in the chow hall wear masks, and all inmates are required to wear masks while standing in line to get a food tray.

. The staff in Education and Medical typically wear masks, but very few other staff do. Inmates are told to wear masks while walking between buildings by staff who are usually not wearing them, although there are a few staff members who are much more consistent with their own mask and with making inmates wear theirs. We do what the staff tells us to.

. We stand, in crowds of 200 or more to drop off our laundry and again to pick it up. We do that two or three times per week. We stand in a crowd to get into Unicor, to get out of Unicor for lunch and to get out of the factory at the end of the day.

. Recreation is open again, releasing multiple housing units together for the gym, fitness equipment and crafts.

. Education began classes again in September. The instructor for a class I am taking was out the last week in October and the first two weeks in November because both he and his wife had COVID-19. He is a contractor, not a BOP employee.

TRULINCS 17813027 - CLINTON, KEVIN - Unit: MIL-H-A

--------------------------------------------------------------------------------

. A search of The American Heart Association website for irregular heart beat produces "a quivering or irregular heartbeat (arrhythmia) that can lead to blood clots, stroke, heart failure and other heart-related complications." See https:www.heart.org/en/health-topics/atrial-fibrillation/what-is-atrial-fibrillation-afib-or-af

. Scientific studies continue to increase our understanding of COVID-19 and the risk factors. The CDC shows that people 65-74 are 65 times more likely to die from infection by COVID-19 than the 18-29 reference group. https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by age.html Web page update date 11/22/21

. I will be 65 in February and become part of the 65 and over statistical group.

. With my first motion for compassionate release (Doc No. 79), my physician provided a letter stating "Mr. Clinton is deemed to be at higher risk for morbidity and complications in case of contact with COVID-19 virus due to underlying health issues and his health history, including elevated blood pressure and recurrent bronchitis, as well as a history of tobacco use."

. The CDC website lists high blood pressure as a possible contributing risk factor, but lists smoking as a definite risk factor. It also lists heart conditions, which I now have after my prior COVID-19 infections. https://cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

. The same CDC webpage says "As we are learning more about COVID-19 everyday, this list does not include all medical conditions that place a person at higher risk of severe illness from COVID-19." The page also says "81% of COVID-19 deaths occur in people over 65", although their statistical grouping is 65 and over. It also says for people age 65 and over, there is an 80 times greater risk of death from COVID-19 than for 18-29.

. . The page further explains "A person with a condition that is not listed may still be at greater risk of severe illness from COVID-19 than people of similar age who do not have the condition and should talk to their health care provider." My physician provided a letter to the court with his opinion regarding my risk while my assigned Milan Health Care provider cannot get answers for me about my heart.

. . I received two doses of Moderna in June and July 2021. Many studies have found, and courts have recognized, having the vaccine does not provide immunity from COVID-19.

"Uncertainty still surrounds the degree and duration of protection vaccines provide against the virus or its mutations. At least one court has found in light of the pandemic, a defendant's age and underlying health conditions constitute an extraordinary and compelling reason to grant release even though the defendant was vaccinated and had previously contracted COVID-19. See United States v. Sweet, No. 07-220369, 2021 WL 1430836, at *2 (E.D. Mich. Apr. 15, 2021) (granting compassionate release to a 73 year-old with chronic kidney disease and smoking history despite vaccination

5

and previous COVID-19 diagnosis, finding "The threat of severe illness or death from COVID-19, while diminished, is nevertheless real." United States v. Lonich, Nos. 14-cr-00139 and 17-cr-00139, 2021 U.S. Dist. LEXIS 81562 (N.D. Cal. Apr. 28, 2021)

. "Defendant further presents expert testimony of infectious disease specialist and UCLA assistant clinical professor Tara Vijayan, M.D., M.P.H., who asserts that reinfection of people who have recovered from COVID-19 is possible and 'more likely in an environment where re-exposure with a high viral inoculum is likely. Prisons and jails are such environments.' Id. Dkt No. 467 (Def.'s Reply)" Id

. Reports of multiple infections and of vaccinated individuals being infected and dying are found in many courts. "The court also cited reports from the Bureau of Prisons about inmates who had twice tested positive for COVID-19, and a news article reporting on initial statewide health data suggesting 246 vaccinated persons contract COVID-19 and three of those persons died. United States v. Sweet, No. 07-220369, 2021 U.S. Dist. LEXIS 69177, at *2 (E.D. Mich Apr. 15, 2021)." United States v. Smith, Nos. 2:98-cr-00009, 2:96-cr-00450, 2021 U.S. Dist. LEXIS 90076, (E.D. Cal. May 11, 2021).

. The 7th Circuit recently published a ruling related to extraordinary and compelling. "A prisoner who can show that he is unable to receive or benefit from a vaccine still may turn to [3582(c)(1)(A)], but, for the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release." United States v. Broadfield, No. 20-2906, 2021 U.S. App. LEXIS 21580, (7th Cir. Jul 2021) Black's Law Dictionary defines benefit as advantage. Id.

Is The purpose of a vaccine is to eliminate (actually or statistically) the disease so that no one suffers the adverse outcomes? If the disease could not be prevented but all adverse outcomes could, the vaccine would be successful. The benefit of a vaccine is prevention or reduction of the adverse outcomes.

. If a new COVID vaccine were announced tomorrow that prevented all risk of death, organ damage, brain damage, and all other known or suspected permanent results but the patient still suffered through two weeks of flu like symptoms, it would be heralded as a huge break-through. It would surpass all of the other vaccines.

The benefit of a vaccine is prevention or reduction of the adverse outcomes, not prevention of the disease. Prevention of the disease is not a requirement to get the benefit of a vaccine.

. Regardless of the effectiveness of a vaccine, which is not useful to debate here, my risk of death (after infection) is 65 times the risk of an infected 18-29 year old, according to the CDC. Id. His benefit is 65 times more than mine, UNLESS the vaccine eliminates the adverse outcomes. If we each have the same risk after infection, we each get the same benefit from the vaccine.

. The flu vaccine is an excellent example. Each year the vaccine has different effectiveness rates depending on the

TRULINCS 17813027 - CLINTON, KEVIN - Unit: MIL-H-A

---

strain. While it may prevent a patient from catching the flu, but it provides a reduction of severity for patients that do get it. It reduces the risk of Intensive Care Unit stays for hospitalized patients and reduces the risk of death in children. The benefit is not immunity, it is the reduction of adverse outcomes.
https://www.cdc.gov/flu/prevent/vaccine-benefits.htm

. The CDC says the COVID-19 vaccine is safe and helps prevent people from getting sick. It can also reduce hospitalization. Regardless, the CDC recommends that vaccinated people continue to wear a mask "particularly if they or someone in their household is immunecompromised or at increased risk of severe disease, or if someone in their household is unvaccinated." Even if vaccinated, a person at increased risk of severe disease is still at serious risk and others should wear masks to protect them from infection. This also clearly explains that vaccinated people can still carry the virus and spread it, and should remain masked around those that are at increased risk of severe disease.
https://www.cdc.gov/coronavirus/2019-ncov/vaccine/vaccine-benefits.html

. I am still at significant risk of severe illness, especially in a place with no social distancing, a serious lack of sanitation and staff that do not consistently follow any of the CDC guidance.

. The Seventh Circuit clarified that the vaccine makes extraordinary and compelling unavailable "for the vast majority of prisoners" Id. Black's defines majority as a number that is more than half of the total. Id. Black's does not define vast, but Webster's defines it as huge or enormous but offers no quantifiable measure. Id. According to the BOP statistics, 6.1% of federal inmates are over 60 years old. Id. I have no way to determine how many over 60 are healthier than me or how many under 60 are less healthy than I am, but presuming it balances out, 93.9% would be easily considered a vast majority. I am part of the other group the court referred to, where "a prisoner who can show that he is unable to receive or benefit from a vaccine may still turn to [3582(c)(1)(A)]". Id.

. The First Step Act created the opportunity for inmates to request compassionate release from the courts, under 18 USC 3582(c)(1)(A), after requesting compassionate release from the warden of their institution and waiting 30 days. 18 USC 3582(c)(1)(A) "The court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of defendant's facility, whichever is earlier; may reduce the term of imprisonment ..."

. On July 4, 2021, I sent a request to the Warden Hemmingway at FCI Milan (Exhibit G) requesting compassionate release citing my health risks, the health issues caused by my prior infections and the ongoing pandemic. On July 6, 2021, I received a response confirming the warden had received it. (Exhibit H) I received a denial on July 28. (Exhibit I) It has been more than 30 days since the July 6th receipt by the warden. I have satisfied the exhaustion requirement of the

statute.

The Compassionate release statute directs the court to make three considerations, but the Seventh Circuit provided further instruction and clarification regarding proper analysis when evaluating a motion for a discretionary sentence reduction under 18 USC 3582(c)(1)(A) based on extraordinary and compelling reasons.

"At step one, the prisoner must identify an 'extraordinary and compelling' reason warranting sentence reduction. Upon finding that the prisoner has supplied such a reason, the second step of the analysis requires the district court, in exercising the discretion conferred by the compassionate release statute, to consider any applicable sentencing factors in 3553a as part of determining what sentencing reduction to award the prisoner. Id. The Seventh Circuit has also held that "because the Guidelines Manual lacks an applicable policy statement, the trailing paragraph of 3582(c)(1)(A) does not curtail a district judge's discretion. United States v. Gunn, 980 F.3d 1178, 1180 (7th Cir. 2020). This Court is therefore not bound by the Sentencing Commission's analysis in 1B1.13 or the application notes regarding definition of 'extraordinary and compelling reasons.' Id. at 1181." United States v. Thacker, 4 F.4th 569, 576 (7th Cir. 2021)

My 71 month sentence began on October 24, 2019 and would end on September 22, 2025. The BOP calculates that I will receive 10.65 months of Good Conduct Time leaving 60.35 months and a release date of November 6, 2024. (Exhibit J)

The BOP further calculates, on the same form, I'm eligible for release to home confinement on May 6, 2024.

TRULINCS 17813027 - CLINTON, KEVIN - Unit: MIL-H-A

--------------------------------------------------------------------------------

The First Step Act, Pub. L. No. 115-05, 132 Stat. 15 (2018), signed into law on December 21, 2018, provides comprehensive federal criminal justice reform.

One of the provisions of the First Step Act is that eligible inmates would be able to earn First Step Act Time Credits for participation in Evidence-Based Recidivism Reduction Programs and Productive Activities. The First Step Act Time Credits earned by inmates would be applied towards prerelease custody and supervised release, reducing an inmate's time in prison. 18 USC 3635 (4)(C)

Eligibility for the First Step Act Time Credits (FSA Time Credits) is detailed in 18 USC 3632 (d)(4)(D) and contains over five pages of criminal violations that preclude an inmate from earning the FSA Time Credits. Review of the exclusion list confirms that I am eligible to earn FSA Time Credits.

Under the First Step Act, the Attorney General was required to create a risk and needs assessment system called "Prisoner Assessment Tool Targeting Estimated Risk and Needs" (PATTERN) as specified in 18 USC 3632(a), and to "determine the type and amount of evidence based recidivism reduction programming that is appropriate for each prisoner and assign each prisoner such programming accordingly" 18 USC 3632 (a)(3).

The Attorney General was required to develop the needs assessment system, PATTERN, within 210 days of the law's enactment on December 18, 2018. 18 USC 3632 (a). Due date: July 19, 2019.

In defining the BOP start date, 18 USC 3621(h)(1) clearly specifies the date as 180 days after the PATTERN due date, for a due date of January 15, 2020 and then follows up with the implementation requirements. "Not later than 180 days after the Attorney General completes and releases the risk and needs assessment system [PATTERN] ... the Director of the Bureau of Prisons shall":

3621(h)(1)(A) - "implement and complete the initial intake risk and needs assessment for each prisoner ... and begin to assign prisoners to appropriate evidence-based recidivism reduction programs based on that determination;"

3651(h)(1)(B) - "begin to expand the effective evidence-based recidivism reduction programs and productive activities it offers and add new" programs and activities.

3651(h)(1)(C) - "begin to implement the other risk and needs assessment tools necessary to implement the system over time, while prisoners are participating in and completing the evidence-based recidivism reduction programs and productive activities."

The way I earn FSA Time Credits for participating in the programs and activities is in 18 USC 3632 (d)(4), including:
(i) a prisoner shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.

(ii) a prisoner determined by the Bureau of Prisons to be at a minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.

TRULINCS 17813027 - CLINTON, KEVIN - Unit: MIL-H-A

---

. It also specifies that Time Credits are not optional. The word "shall" is significant.

. 18 USC 3621(h)(3) addresses the two year phase in of the program, beginning on the due date of the completed PATTERN assessment: January 15, 2020. "Priority during phase-in. -- During the 2 year period described in paragraph (2)(A), the priority for such programs and activities shall be accorded based on a prisoner's proximity to release date." By making it a priority to provide programs to prisoners based on proximity to release date, the statute makes it clear that prisoners who earn sufficient time credits during the phase in period could be released prior to the end date of the two year phase in period.

. 18 USC 3621 (h)(4) provides the BOP with the option for "preliminary expansion of evidence-based recidivism reduction programs and authority to use incentives" even before PATTERN is completed. This section, clearly distinguished from other parts of the act, contains "may" rather than "shall" but contains authorization to use the programs and incentives prior to PATTERN completion, which was July 19, 2019.

. "Beginning on the date of enactment of this subsection,", which is December 21, 2018, "the Bureau of Prisons may begin to expand any evidence-based recidivism reduction programs and productive activities that exist at a prison as of such date, and may offer to prisoners who successfully participate in such programs and activities the incentives and awards described in subchapter D." This is an optional provision for the Bureau of Prisons and not to be confused with the requirements mandated in 18 USC 3621(h)(1)(A)-(C)

. When considering statutory construction "words generally should be 'interpreted as taking their ordinary, contemporary, common meaning ... at the time Congress enacted the statute.'" Wisconsin Cent. Ltd. v. United States, 1338 S. Ct. 2067, 2074 (2018) (quoting Perrin v. U.S., 444 U.S. 37, 42 (1979)). Courts must also bear in mind the "fundamental canon of statutory construction that words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Util. Air Regulatory Grp. v. E.P.A., 573 U.S. 302, 3199-20(2014)(quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 1333 (2000)). "When the words of a statute are unambiguous ... judicial inquiry is complete." Connecticut Nat. Bank v. Germain, 503 U.S. 249, 257 (1992). Agencies exercise discretion only in the interstices created by statutory silence or ambiguity; they must always 'give effect to the unambiguously expressed intent of Congress.'" Util. Air Regulatory Grp., 573 U.S. at 326(quoting National Assn. of Home Builders v. Defenders of Wildlife, 551 U.S. 6444, 665 (2007) (quoting Chevron, U.S.A, Inc. v. Natural Resources Defense Council, Inc., 467, U.S. 837, 843 (1984)).

To determine whether the BOP is required to apply my FSA Time Credits before the January 15, 2022 completion date for the phase-in, the "statute must be read in [its] context and with a view to [its] place in the overall statutory scheme." Util. Air Regulatory Grp., 573 U.S. at 320 (quoting FDA v. Brown & Williamson Tobacco Corp., 5299 U.S. 120, 133 (2000)).

TRULINCS 17813027 - CLINTON, KEVIN - Unit: MIL-H-A

--------------------------------------------------------------------------------

In this regard, Section 3621 (h) requires "Not later than 180 days after the Attorney General" releases PATTERN, "the Director of the Bureau of Prisons shall" ... and then 3621(h)(1)(A) continues "begin to implement ... tools necessary to effectively implement the System over time, while prisoners are participating in and completing the effective evidence based recidivism reduction programs and productive activities." As the plain language states, this statutory provision anticipates that some prisoners will complete the programs within the phase-in period.

. While the statute does not explicitly provide a date when the BOP must apply my earned credits from participation in recidivism reduction programs and productive actives, it does specify that priority will be given to prisoner based on proximity to release date and that some prisoners will complete the program during the 2-year phase in. FSA Time Credits are not optional for eligible prisoners.

. There is no statutory framework for delaying application of incentives I earn during the phase-in program until January 15, 2022, the final date when the BOP must complete the phase-in with respect to "all prisoners". See 3621 (h)(2)(A). Even "all prisoners" indicates that all prisoners must be afforded the PATTERN program but does not exclude that some of the eligible prisoners will participate in, earn incentives and complete the program before the end of the phase-in period.

. Such is supported by the following DOJ statement. On January 15, 2020, the Department of Justice released a statement regarding its performance under the First Step Act:
"Beginning today, inmates will have even greater incentive to participate in evidence-based programs that prepare them for productive lives after incarceration ... As of Jan 15, 2020, inmates will be assigned to participate in [Programs] based on an initial needs assessment."

TRULINCS 17813027 - CLINTON, KEVIN - Unit: MIL-H-A

----------------------------------------------------------------------------------------------------

- At USP Thomson, I began working on January 6, 2020. I worked from 1/6/20 through 9/5/20. My first job was in Facilities, cleaning boiler and pump rooms. I later became the Education Orderly and Adult Continuing Education Tutor. I earned 8 months of Recidivism Reduction Programming Time per 18 USC 3635(3)(c)(xi), which earns FSA Time Credits at the rate of 10 days per 30 days of participation, 18 USC 3632(d)(4)(A)(i) and 5 additional days per 30 days for low / minimum risk per 18 USC 3632(d)(4)(A)(ii) for a total of 120 days, or 4 months. May 7 2024 less 4 months is January 7, 2024

- At FCI Milan, I began working at Unicor, the metal office furniture factory on February 10, 2021. I work in the International Business Office, where I am responsible for time studies helping to optimize our manufacturing. At the end of the year, 12/31/2021, I will have earned 10.6 months of evidence-based recidivism reduction program time, which earns FSA Time Credits at the rate of 10 days per 30 days of participation and 5 additional days per 30 days for a total of 190 days or 5 months and 10 days. January 7, 2024 less 5 months 10 days is July 27, 2023

- In August 2021, I registered for classes at Jackson College, which qualifies for FSA Time Credits under 18 USC 3635(c)(c)(iv). Classes began September 13. At the end of the year, I will have earned 3.5 months evidence-based recidivism reduction program time, which earns FSA Time Credits at the rate of 10 days per 30 days of participation and 5 additional days per 30 days for a total of 53 days or 1 month 23 days. July 27, 2023 less 1 month 23 days is June 4, 2023.

- Continuing to use January 1, 2022 as a base of reference, I will have 17 months and 4 days to serve as of January 1, 2022. Along with each month, I will also continue to earn FSA Time Credits. I will earn 15 days for each 30 days of evidence-based recidivism reduction program time at Unicor, and 15 days for each day of evidence-based recidivism reduction program time at Jackson College. For each passing month, I will earn credit for the calendar month time served, plus 30 days of FSA Time Credits. It will take me 8 months and 17 days to complete the final time of my sentence. I will complete my sentence on September 17, 2022.

- I have just under 12% of my time left to complete my sentence.

- I have permanent heart damage from COVID infections that increase my risk of death if I am infected again.

- I will be 65 in February, moving my risk assessment into the statistical category where 81% of the deaths from COVID-19 occur and the group the CDC says is 85% more likely to die.

- In United States v. Reed, the Court noted that most federal inmates are 31-45 years old and observed the increased risk that age alone provides. United States v. Reed, 2021 U.S. Dist. LEXIS 55746, No. 3:06-cr-75, (N.D. Ind. Mar. 2021) In that case, the defendant had served 71% of his sentence, which like mine was at the top of the sentencing guideline.

- The Court noted "An early release would be inconsistent with the goals of consistent sentencing among similar offenders, but an early release might foster respect for the law, which includes Congress's grant of authority to release

TRULINCS 17813027 - CLINTON, KEVIN - Unit: MIL-H-A

--------------------------------------------------------------------------------

offenders for extraordinary and compelling reasons." Id.

At the low end of the guideline, as the Court evaluated for Reed, I would have five months, five days left to serve as of January 1, 2022, which would be complete, with FSA Time Credits included, on March 17, 2022.

. I am housed in a facility that did not do well with COVID-19 according to the Department of Justice Office of the Inspector General and has documented issues with sanitation. I'm located in a state currently experiencing a 68% increase in COVID-19 infections giving it the highest period infections in the entire pandemic.

. My health issues identified by my physician are listed on the CDC website.

. My heart issues resulting from COVID-19 are listed on the test results even if I can't ask the BOP questions about them. They are also included in the heart issues according to the CDC, and also by the American Heart Association, UCLA and Harvard University.

. I am no longer in "reasonably good health" (Doc No. 92) and the safety of FCI Milan is suspect according to the Department of Justice Office of the Inspector General's report. As the Court Order noted in denying my prior request (Doc No. 92) "[my] age, the non violent nature of [my] crime, and low risk of recidivism support [my] compassionate release."

. I have a specific re-entry plan, which the Court acknowledged last time was unlike most defendants: I will live with my wife and our daughters in our family home. With reasonable notification, my wife and daughters would be able to be at Milan in just over 4 hours to pick me up. They would bring clean clothes for me and a clean mask. Once we arrive at home, I will self quarantine for 14 days to be certain that my family stays safe.

. Since incarceration, I have always found and maintained a job before it was required, and I have been conscientious in my work, never late or missing a day. I have helped other inmates to learn, doing tutoring in math, marketing and business. I've also volunteered to teach a Six Sigma certification class for process efficiency in the factory. I attend my classes as scheduled and consistently complete my work ahead of time.

. My conduct has been excellent. With the exception of the two incident reports that I received for using an "intuitional phone" for arranging to wave to our daughters from the inmate track, I've had no issues. I've caused no problems at Thomson or Milan.

. With a short time left to serve, given my health issues, the other details presented, and considering the severity of the risks, I respectfully request the Court grant me compassionate release at this time.

Respectfully submitted,

Signed and mailed at FCI Milan on November 30, 2021


Kevin Clinton
11/30/21

13